BRUMFIELD *v.* STATE.[*]

(Division B.   June 11, 1928.)

[117 So. 529.   No. 27031.]

---

[*]Corpus Juris-Cyc. References: Criminal Law, 17CJ, p. 130, n. 84; Homicide, 30CJ, p. 316, n. 68; p. 329, n, 20.

*Williams & Hunt,* for appellant.

*Rufus Creekmore,* Assistant Attorney-General, for the state.

PACK, J. Appellant was indicted and tried for murder, resulting in the conviction of manslaughter, and was sentenced by the court to ten years' imprisonment.

His first assignment of error is, the testimony for the state was insufficient to warrant a conviction, and there should have been a directed verdict for appellant.

The evidence for the state tended to show that two shots were heard after dark on a certain Saturday night some two hundred yards from a farmhouse, and, after the lapse of a few seconds, a volley of other shots were heard; that seemingly two pistols were being used. On investigation, the dead body of George Gatlin was found "crumpled up" by the side of a tree, with the back toward the road, and one hand on one side of the tree and one hand on the other side. It was found some six or eight feet west of the public road, which runs north and south. A bullet wound, showing powder burns, was found at the base of the neck, on the left side, ranging downward. Another bullet wound entered the right arm near the shoulder, ranging upward, and broke his neck. Blood was found nowhere, except at the body. A bullet had been shot into the ground between the body and the road; the bullet entering the ground at a forty-five degree angle, having been fired from the west. A .38 caliber pistol, identified as having belonged to deceased, was found about two feet from his left hand, the pistol showing that two cartridges had been fired, and one had snapped.

Shortly after the shooting, appellant, accompanied by Walter Dillon and Will Tolbert, passed the wife of the deceased, who inquired, "Where is George?" (referring to deceased). Appellant replied "The s— of b— is dead down there now," he supposed. On the following day, appellant stated to one Dulaney that he, Walter Dillon, and Will Tolbert met deceased at the place of killing;

that deceased asked Dillon for his (deceased's) pistol; that Dillon replied, "Dent has it," whereupon deceased shot him; that he jumped off the back of the buggy, ran along until he could get his pistol out, and he then went to shooting him.

There seems to be no dispute that the pistol of deceased was in possession of appellant as the three went down the road toward the place of killing.

Appellant introduced three white men who testified that his general reputation for peace or violence in the community was good. He also introduced Dillon and Tolbert, who testified, substantially, that shortly before the killing they left the home of deceased, driving south in a one-seated buggy, George riding on the back thereof; that they met one Jim Barnes, who got into a quarrel with deceased; that the two witnesses thereupon returned northward, found appellant, and got him to return to the scene to assist in separating Barnes and deceased. The three met deceased, who, with pistol in hand, commanded them to stop the horse. On stopping, the deceased said, "Walt, give me my God damn pistol;" Walter replied, "Dent (appellant) has it;" that deceased then walked to the side of the buggy, on the west side, and fired at appellant, who fell to the ground; that deceased raised his pistol as if to fire again, when both witnesses jumped from the buggy and ran; that, as they ran, they heard a second shot, and heard appellant say, "George, what you shooting me for?" that they then heard several shots, but did not know by whom; that appellant then called them, and, as they returned, they saw appellant "backing out toward the road."

Appellant testified that, after deceased shot him in the arm, he (deceased) ran; that he (appellant) also ran, and jumped upon the bank of the road, on the west side, and found he was being pursued by deceased; that de-

ceased fired at him, when appellant pulled his pistol and shot deceased, and continued to shoot until he fell.

Appellant earnestly contends that his evidence makes out a case of self-defense, leaving no question for the jury to decide. Where the testimony of eyewitnesses to a homicide makes out a case of self-defense, it is the right of the defendant to have a directed verdict. But, if the testimony of such witnesses is unreasonable, or is in conflict with physical facts or circumstances in evidence, it is a question to be submitted to the jury. *McGehee* v. *State,* 138 Miss. 822, 104 So. 151; *Grady* v. *State,* 144 Miss. 779, 110 So. 225; *McFatter* v. *State,* 147 Miss. 133, 113 So. 187; *Sullivan* v. *State* (Miss.), 115 So. 552.

A careful and repeated investigation of the facts of this record leads us to the conclusion that there was such conflict as to take the case to the jury. The two defense witnesses were able to tell how the difficulty began, but could tell nothing of what happened after they fled. They heard shots, but by whom, and who was the aggressor, they could not tell. If deceased was shot in the road, as claimed by appellant, then why no blood signs there? When, where, and how did deceased procure another pistol; his own pistol being in appellant's possession? The wounds, range of bullets, powder burns, the bullet in the ground, contradictory statements of appellant made to Dulaney, his remarks to the wife of deceased immediately following the killing, the position of deceased between the wheels when it is claimed he shot appellant in the left arm while appellant stood on the back of the buggy, the position of, and place where the body was found, were some of the physical facts and circumstances warranting a submission of the case to the jury.

It is next argued that appellant was denied a constitutional right when the court permitted the county attorney to merely read the instructions to the jury, leav-

ing the remainder of the time to the district attorney for the concluding argument; appellant then having no chance to reply thereto. It seems from the record this point was not raised, except by motion for new trial. No special bill of exceptions were taken and made a part of the record in either of the ways authorized.

In *King* v. *State,* 146 Miss. 285, 111 So. 378, this court held:

"The only way that matters of this kind can be brought to this court and assigned for error is for them to be embodied in a special bill of exceptions, which bill must show an abuse of discretion in that regard"—citing *Cartwright* v. *State,* 71 Miss. 82, 14 So. 526; *Powers* v. *State,* 83 Miss. 691, 36 So. 6.

Finding no error in the record, the judgment of the court will be affirmed.

*Affirmed.*