# Vance *v.* State.

(Division A. Sept. 12, 1938.)

[183 So. 280. No. 33130.]

Louis C. Hallam and Hugh F. Causey, both of Cleveland, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

Argued orally by **Louis C. Hallam** and **Hugh F. Causey**, for appellant, and by **W. D. Conn, Jr.**, and **Walter Sillers**, for the State.

**McGowen, J.**, delivered the opinion of the court.

On an indictment for murder in the killing of Harrington, the appellant was convicted by a jury of manslaughter and sentenced to serve a term of twenty years in the state penitentiary.

As we have determined that this case must be reversed and remanded for another trial, we shall not un-

dertake to state a detailed account of all the facts to be found in the voluminous record, and because of the points seriously urged for reversal we shall not undertake to detail the facts in the order found in the record.

Between 9:30 and 10 o'clock on the night of June 8, 1937, Vance shot Harrington in the drugstore of the former, located in the town of Shaw. Harrington was night marshal there. Vance operated a drugstore and was the bus agent for that town and had a space used as a waiting room for bus passengers in the rear of the drugstore; a liquor store was also operated in the rear of the drugstore where negroes were served. This place of business faced west and was separated from the railroad, running north and south, by a fifty or sixty foot street, the depot was slightly south and west of the drugstore. Prior to the time Vance prepared to close his drugstore for the night, one of his negro helpers, Brinson, became intoxicated; Vance led him to the front door and instructed another negro to take him home. Later the latter negro returned to the drugstore and told Vance that Brinson had been given a beating and locked up in jail. When so informed, Vance said, ''I will pay him out in the morning if it takes every nickel I have.'' He then prepared to close his drugstore by getting everybody out, examining the doors and fastening them in the rear partition, checked his cash and placed the money in a safe and took from the safe a 38 Special Smith and Wesson pistol. He unbuttoned his shirt and placed the pistol therein, leaving two or three buttons unfastened. He testified that he was in the habit of carrying the pistol home at night because six or seven weeks before his home had been burglarized. His daughter was in the drugstore waiting for him in order to carry him and his wife riding. After turning out the lights, except one, and unfastening the screen doors Vance took a Yale lock from one of the doors for the purpose of closing and locking both doors with it. As he was so doing his daughter spoke to him and engaged

him in conversation. At this time he saw Harrington across the street some fifty or sixty feet away. He and his daughter were then standing on the sidewalk in front of the drugstore. Vance called to Harrington and Harrington replied, ''hey''; whereupon Vance said, ''Come here, you cowardly s— o— b—.'' Vance claimed that he spoke the latter words in a low tone of voice and did not intend for Harrington to hear him, but witnesses at a distance of one hundred and fifty feet claimed to have heard this entire conversation. After Vance made this statement Harrington came across the street, and as he came around a parked car in front of the drugstore he had his pistol in his right hand and drawn. He came toward Vance and said, ''What did you say,'' speaking with anger, and when Vance saw that Harrington was angry and had his pistol pointed at his stomach, Vance said, ''Mr. Harrington, if I have said anything to hurt your feelings I apologize.'' Harrington refused to be reconciled, and then Vance said, ''Are you going to shoot me in the presence of my daughter?'' Whereupon, seeing that Harrington was still angry, Vance started into the drugstore but Harrington continued to hold the pistol pointed at him and rushed into the drugstore ahead of Vance. Vance's daughter followed him into the drugstore. After they were in the store Vance said, ''if you are going to shoot, shoot;'' whereupon Harrington struck Vance on the head with a 45 Colt pistol and knocked him back through the door and vestibule, his daughter undertook to assist Vance to arise and before he had gotten erect Harrington struck him again and discharged his pistol two or three inches above his head toward the door. At this time Vance drew his pistol while still in a crouching position and discharged it at Harrington's head. Harrington spun around and Vance continued to discharge his pistol rapidly. It later developed that Vance had fired five shots.

Vance claimed that he was knocked groggy, and that blood was running in his eyes so that he could not see

well, but he said that after he fired the first shot Harrington turned around. Vance contended that the blow to his head was a heavy one, Harrington being a man five feet eleven inches tall and weighing more than two hundred pounds.

Up to the time Vance fired his first shot, his testimony was corroborated in detail by his daughter and a negro witness who was across the street near the depot. The negro testified that Harrington hit Vance a "pretty good blow," and that Harrington discharged his pistol in the direction of the negro; that he heard the bullet pass between him and the depot, and that he ran away. The daughter thought that she was knocked down by Harrington as he "spun" around, and she did not know anything about the position of the parties after the first shot was fired.

An officer carried Vance to Cleveland where he was treated by a physician who found two cuts to the skull on his head to the right of and above his left ear, one blow was across the front of the head and the other was straight down, the two forming a T. When Vance reached the physician's office he was bleeding profusely.

When parties arrived at the scene of the shooting Vance was standing in front of his store and was bleeding, his face, shirt and trousers having blood on them, and he told an officer that some men had shot Harrington and his daughter, and that he had pulled Harrington into the store and discharged his pistol at the disappearing automobile of the men who had fired the shots. The first witness on the scene testified that Vance told him that Harrington had shot his beautiful daughter and he had to kill him. Vance's statement that he was knocked through the door of his drugstore was corroborated by all the evidence in the case. According to two ladies who were driving by, they saw the rear of Vance's body as "he rolled out of the drugstore like a ball;" saw him go immediately back; saw a man in a blue shirt, which was Harrington, and saw the blaze of a pistol going in

Harrington's direction. They did not see or hear any shot from Harrington's pistol.

The examination of the scene showed that one 38 bullet had lodged in the north door facing about five feet from the floor, ranging upward in a northwesterly direction, another 38 bullet, which was taken from the floor, was apparently fired in an easterly direction. There were two bullet holes in Harrington's back; his shirt was powder burned; he had one wound in his temple about an inch and a half above and two and a half inches in front of the tip of his right ear, and a small scalp wound at the top of his right ear about the size of a dime. Harrington's body was face downward on the floor of the drugstore with his feet in the rail in front of the soda fountain and his head toward the door, about six feet therefrom. One bullet had pierced the floor and subflooring and was taken from the sill about opposite the hole in his stomach, the exit of one of the bullets which entered his back. According to the evidence another 38 bullet was taken from the back of Miss Vance, but it was a spent bullet and caused only a flesh wound. A witness took Harrington's pistol from beneath his body as he was lying on his stomach; he had his finger on the trigger guard, and one bullet had been discharged, but the witness testified that the pistol did not evidence having recently been discharged, and the shell in the pistol was an old one. The pistol had no blood on it though there was a pool of blood at that spot. One of the bullets entered Harrington's back three inches to the left of the spine and eight inches above the pelvic bone; the other entered his back five inches to the left of his spine and seven inches above the hip bone. The points of exit were in the stomach, one four inches to the left and two inches above the navel, the other four inches to the left and three inches below the navel.

Many witnesses testified that Vance was groggy and talked at random, and the physician also so testified but he attributed this condition to the blows on his head.

Vance did not testify on the trial before the jury but his testimony taken by a stenographer at a preliminary hearing and also on a habeas corpus hearing was introduced by the state. There was the usual contradiction of the witnesses both for the state and the defense as to statements made at the former trial. It is evident from a reading of the record that the state witnesses had strengthened their testimony on the last hearing.

1. It is contended by the appellant that he was entitled to the peremptory instruction requested by him and refused by the court below, on the theory that when the testimony of eyewitnesses is not in conflict and is so entirely reasonable and so consistent with all the circumstances, including the physical facts, and makes out a case of self-defense, that testimony must be accepted by the court as true. Thornton v. State, 178 Miss. 304, 170 So. 541. Without an elaborate discussion of this point we are of the opinion that there was sufficient conflict on material matters of substance to make the question of guilt or not one for the jury. The jury might have found from the evidence in this case that Vance and his witnesses were contradicted as to Harrington having discharged his pistol. Vance was contradicted as to whether or not he had spoken in a low tone of voice when he applied the opprobrious epithet to Harrington. The direction of the bullets, as indicated by the pieces of flooring sent up to this court, show that some of Vance's bullets were fired from the east to the west and some from west to east. The bullet hole in the floor beneath the body of Harrington and the powder burns on his shirt show that the bullet must have been discharged in his body after he had fallen to the floor, the expert testimony being that the bullet wound in the temple would produce instant death—that one so shot would "fall like an ox." The physical facts and Vance's version are not in harmony. When the testimony of eyewitnesses is in material respects unreasonable, or is contrary to the evidence of attendant circumstances, includ-

ing the physical facts, the case must be submitted to the jury. Smith v. State, 167 Miss. 85, 147 So. 482; Brumfield v. State, 150 Miss. 552, 117 So. 529; McFatter v. State, 147 Miss. 133, 113 So. 187; Grady v. State, 144 Miss. 778, 110 So. 225; McGehee v. State, 138 Miss. 822, 104 So. 150.

2. Appellant assigns as error the granting of instruction No. 1 for the state, which is as follows:

"The court instructs the jury for the State that if you believe from the evidence in this case beyond a reasonable doubt that in the difficulty in which E. C. Harrington lost his life, that the defendant, J. C. Vance, was the aggressor and the provoker of the difficulty, and that he prepared himself for it by arming himself with a deadly weapon, to-wit: a pistol, and in fact was armed at the time he entered the difficulty with the deceased, and with intention and design to carry out his original intention to seek out the deceased for the purpose of provoking a difficulty with him and using his weapon if necessary to overcome the deceased, and that he sought out the deceased and brought on and provoked the difficulty being the aggressor therein intending to use his pistol and overcome his adversary, if necessary, and that in pursuance of such former design, that he then killed the deceased, E. C. Harrington, with the said pistol aforesaid then the defendant, J. C. Vance, is guilty of murder and he cannot, according to the laws of this State, be heard to say he acted in self defense, even though he killed the said E. C. Harrington under such circumstances as otherwise would appear to the jury to be in self defense."

This instruction was one which sought to cut off self-defense on a given state of facts. It will be observed at once that the instruction assumed that there was evidence on which the jury could find that the appellant armed himself for the difficulty, and that he had an original intention to seek out Harrington for the purpose of provoking a difficulty. The evidence in this case is un-

disputed that Vance closed his store in the usual manner; that there had been no difficulty between Harrington and Vance; that they were friendly, Vance's half brother had married Harrington's daughter. Vance armed himself with a pistol in the usual manner and according to his usual custom for a period of six or seven weeks. There is nothing in the record to show that Vance knew that Harrington was the officer who had arrested his negro employe. There was no dispute but that his house had been burglarized, and there is nothing in the record to indicate any purpose on his part to see Harrington on that night, or to have difficulty with him until after he was in the act of finally locking his store door. He called Harrington a foul name which was an insult and sometimes in some localities calculated to provoke a difficulty, but when he saw that Harrington took offense he apologized and sought to get away from Harrington. There was no evidence upon which to base the assumption, and this court has held that such an instruction is reversible error. Patterson v. State, 75 Miss. 670, 23 So. 647; Fore v. State, 75 Miss. 727, 23 So. 710; Lofton v. State, 79 Miss. 723, 31 So. 420; Williams v. State, 90 Miss. 319, 43 So. 467; Cooper v. State, 80 Miss. 175, 31 So. 579.

This instruction was squarely in conflict with instructions given the defendant to the effect that if Vance apologized to Harrington for uttering the epithet he would have the right to defend himself from a deadly attack. Hartfield v. State, 176 Miss. 776, 170 So. 531. Warning has been given by this court that it is a rare occasion when this instruction is proper, and only when the facts necessary to sustain it are in evidence.

3. Instruction No. 2 is also assigned as error, and is as follows:

"The Court instructs the jury for the state that the law tolerates no excuse and accepts no justification for the shooting of one individual by another upon a plea of self defense, unless it be reasonably necessary so to do

in order to save the defendant from great bodily harm or to save the life of the individual who fires the shot, *at the very time the fatal shot was fired;* and in this case if you believe from the evidence beyond a reasonable doubt that the defendant J. C. Vance, wilfully, unlawfully, feloniously and of his malice aforethought shot and killed E. C. Harrington at a time when he, the said J. C. Vance was not in any immediate danger, real or apparent, of losing his life or of suffering great bodily harm at the hands of the said E. C. Harrington, then the defendant, J. C. Vance, is guilty as charged and it is the sworn duty of the jury to so find.

"The Court further instructs the jury for the State that the malice aforethought necessary to constitute murder in this case need to have existed for only an instant before the fatal shot was fired. (Italics ours).

Under all the evidence as to what occurred in the store during the difficulty, the phrase "at the very time the fatal shot was fired" circumscribed the right of self-defense within too narrow limits, and has been in principle heretofore disapproved by this court. See Fortenberry v. State, 55 Miss. 403; Ellerbee v. State, 79 Miss. 10, 30 So. 57; Bang v. State, 60 Miss. 571; Dyson v. State, 26 Miss. 362; Case v. State, Miss., 17 So. 379. It was as harmful in this case.

4. It is urged that a manslaughter instruction was improper in this case. Taking into consideration the undisputed fact that Vance was knocked down by Harrington with a 45 pistol, and that the state's evidence tends to show that Vance having been knocked out of the store immediately went forward and returned to the difficulty and fired the shot either in Harrington's head or his back at close range, ten or twelve feet from the door, the jury were warranted in determining that Vance shot Harrington because of the passion aroused by the blows inflicted upon his head, and were warranted in finding that Harrington did not discharge his pistol, as testified to by Vance and his witnesses. A man-

slaughter instruction was proper, but the phrase in the instruction "but in a cruel and unusual manner" was not proper in this case although it was copied from Section 994, Code of 1930. This homicide was in the most usual manner, insofar as the instruments used to bring about the death are concerned. Klyce v. State, 78 Miss. 450, 28 So. 827.

5. The action of the court in permitting the physician who extracted the bullet from the back of Miss Vance to testify to that fact and to identify the bullet so removed is assigned and argued as error. The purpose of this testimony was to show that the wound suffered by Miss Vance was caused by a 38 Smith and Wesson bullet fired from the pistol of appellant. Harrington's pistol was a 45 Colt. The state desired to contradict Vance's statement, made immediately after the difficulty, that Harrington had shot his daughter. This testimony was objected to by the appellant and by attorneys for, and the parents of, Miss Vance, she being a minor. According to the state's theory, Miss Vance was the victim of her father, insofar as her bullet wound was concerned, and under the cases of Davenport v. State, 143 Miss. 121, 108 So. 433, 45 A. L. R. 1348, and Maddox v. State, 173 Miss. 799, 163 So. 449, the appellant could not complain that the court erred in permitting the evidence of the physician to be disclosed on the trial. The privilege conferred by Section 1536, Code of 1930, regarding communications between physician and patient, is for the benefit of the patient alone. Jenkins v. State, 146 Miss. 339, 111 So. 433; 5 Wigmore on Evidence (2 Ed.), Sec. 2358. Although the privilege is limited to patient and physician by the statute this court has held that it may not be waived by a decedent's heirs, executor, or administrator. McCaw v. Turner, 126 Miss. 260, 88 So. 705. Likewise, the beneficiary in a policy of life insurance is entitled to interpose and have sustained an objection to the evidence of the physician as to privileged communications between him and

the deceased insured as against the insurer. United States Fidelity & Guaranty Co. v. Hood, 124 Miss. 548, 87 So. 115, 15 A. L. R. 605. We conclude that even if it was error for the court to have admitted the testimony of the physician over the objection of Miss Vance, in a legal sense that cannot operate in favor of the accused, and he cannot complain thereasto.

There are many assignments of error in this record, some of which are serious and some of which are not, which we do not deem it necessary to now pass upon, as most likely they will not occur in another trial. For the errors in the instructions pointed out this case must be remanded for another trial.

Reversed and remanded.