401 So.2d 1282 (1981)
John Wesley PARKER
v.
STATE of Mississippi.
No. 52655.
Supreme Court of Mississippi.
July 29, 1981.
John E. Gregg, Raymond, for appellant.
Bill Allain, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and LEE and HAWKINS, JJ.
*1283 LEE, Justice, for the Court:
John Wesley Parker was convicted in the Circuit Court of Claiborne County, Honorable John W. Prewitt, presiding, of shooting into an occupied building, and was sentenced to serve ten (10) years with the Mississippi Department of Corrections, five (5) years to be served, and five (5) years suspended, with three (3) years on supervised probation. He appeals from the sentence and judgment of the lower court and assigns three (3) errors in the trial.
On the morning of January 3, 1980, an altercation took place in front of the Claiborne County Courthouse between Fred N. Tisdale and Eddie Ray Parker, brother of appellant. The State's evidence was to the effect that appellant had gone to the courthouse to obtain a car tag while appellant's evidence indicated that he had gone there for the purpose of collecting four hundred fifty dollars ($450.00) in back wages owed by Board Member Roosevelt Yarbrough to appellant's wife. At any rate, appellant and Eddie Ray Parker met Tisdale after they left the courthouse, angry words were exchanged, and Tisdale threatened appellant with a gun. The Parkers and Tisdale met again at the police station where they each had gone to make an affidavit against the other. After the meeting at the police station, the Parkers went to the courthouse for the purpose of having a property examination made in order to execute an appearance bond. There, they once again encountered Tisdale across the street from the courthouse, and an argument ensued. Eddie Ray Parker had a .38 caliber pistol in his coat and gave his car keys to appellant, telling him that there was a 30-30 rifle in the trunk of the car. Tisdale fired two shots at Eddie Ray Parker from inside his truck, one of which struck him in the leg. Eddie Ray Parker returned the fire and wounded Tisdale who fled on foot into the courthouse. At this juncture, appellant returned from Eddie Ray Parker's car carrying a 30-30 rifle and proceeded toward the courthouse after Tisdale. He fired two (2) shots through one of the courthouse windows, apparently at Tisdale.

I.
Did the trial judge err and subject appellant's counsel to unduly harsh treatment which deprived appellant of his legal and constitutional right to a fair trial?
*1284 In commenting upon the influence a trial judge has on the jury during the trial of a case, the Court said in Green v. State, 97 Miss. 834, 53 So. 415 (1910):
"It is a matter of common knowledge that jurors, as well as officers in attendance upon court, are very susceptible to the influence of the judge. The sheriff and his deputies, as a rule, are anxious to do his bidding; and jurors watch closely his conduct, and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict. He cannot be too careful and guarded in language and conduct in the presence of the jury, to avoid prejudice to either party." 97 Miss. at 838, 53 So. at 416.
The Court also in Garrett v. State, 187 Miss. 441, 193 So. 452 (1940) stated: "Should a case arise in which it is obvious that a judge had been partial, biased or prejudiced, and that his attitude and conduct had brought about an unfair trial, the Court would reverse the case and grant a new trial." 187 Miss. at 455, 193 So.2d at 455.
Some of the comments complained about by appellant as prejudicing the jury were made outside the presence of the jury. Those remarks could not have been the basis for prejudice as stated in Merchants Co. v. Hutchinson, 186 So.2d 760 (Miss. 1966):
"There are other errors in the record, the most serious of which involves statements the trial judge made in the presence of the jury, which could have prejudiced the jury against appellants." 186 So.2d at 764.
The appellant contends that four (4) comments were made by the trial judge in the presence of the jury which influenced the jury and prejudiced him. They follow:
(1) "BY THE COURT: I have previously asked the Jury if they would follow the law as given by the Court and I'm satisfied that this Jury under their oath has answered that question. Now, counsel is trying to ask in a different way the same question and I'm going to permit counsel to put that of record.

BY MR. McFATTER: The question that I have proposed is that if the Court should later instruct this Jury that there is a defense to shooting into the Courthouse could the Jury follow that instruction regarding a defense for shooting into the Courthouse.

BY THE COURT: Allright, I've let you put that in the record and I'd ask you to move on to another question. And put that in the record."
(2) During cross-examination of Fred Tisdale, the following comment was made:
"BY MR. McFATTER:
* * * * * *
Q. Okay, Mr. Tisdale, where can I start? What's the earliest point you're going [to] testify about, please, sir? You tell me. I'm tired of hunting for it?
A. I don't know what you want to know.

BY THE COURT: Counsel, I'm going to help you a little bit. He started testifying when he started backing in the Courthouse and you  I don't think I have to rehash the testimony, but I believe you're sufficiently intelligent, at least I respect you as such, you know what he's testified about and I permit you to cross examine him to that extent."
(3) The following comment occurred during the rebuttal testimony of Daniel Lucas:
"BY MR. McFATTER: Your Honor, at this point I would request that  it was only about one question on re-cross and Mr. Lucase 
BY THE COURT: (Interposing) You go ahead. I think you can ask him any question you want to. And go ahead. We're not going to take up any time now to go back and look at any question. You use your memory. You've got him on cross examination. You ask him any question.
BY MR. McFATTER: Am I not being allowed to impeach him Your Honor?

BY THE COURT: You're being allowed to cross examine him as fully as *1285 the Court deems it necessary to cover your point, but we are not going back in the record."
(4) The final comment came during the rebuttal testimony of Daniel Lucas on cross-examination. The colloquy follows:
"BY MR. McFATTER: Your Honor, at this point, I would request that the Jury be allowed to make a view from that landing.
BY THE COURT: That will be overruled. I might tell counsel, you've been practicing law a good while and you know when to make a motion to view a scene.
BY MR. McFATTER: I'm pleading surprise, your Honor, I stood down there and looked at it myself 
BY THE COURT: (Interposing) Now, wait a minute. I don't want any speeches. I've ruled. Go ahead.
BY MR. McFATTER: Your Honor, I'm pleading surprise and I would again make my motion for a view from that landing by the Jury at this time.
BY THE COURT: Take the Jury out.
(THE JURY WAS RETIRED FROM THE COURTROOM AND THE FOLLOWING PROCEEDINGS WERE HAD IN THEIR ABSENCE)"
In Vail v. City of Jackson, 206 Miss. 299, 40 So.2d 151, 41 So.2d 357 (1949), the Court said, quoting 64 C.J., at page 92:
"`Counsel may properly be directed to refrain from delay, or to get on with the trial, or the judge may comment upon a waste or excessive consumption of time in the trial so long as counsel is not unduly restricted or his knowledge challenged, or his motives impugned; and remarks expressing impatience with counsel, even though perhaps unwarranted, are not fatal where not such as to cause material prejudice. Ordinarily counsel may not complain of slight or not seriously prejudicial impropriety in remarks or comments by the court where they are provoked by himself.'" 206 Miss. at 328, 41 So.2d at 361.
The motion by appellant's counsel in the presence of the jury for a view of the scene was clearly prejudicial to the State's case and not warranted under the law. Armstrong v. State, 179 Miss. 235, 174 So. 892 (1937). It was calculated to provoke the comment made by the trial judge.
We have carefully considered the comments and actions of the trial judge in his statements to the attorney for appellant and, while the trial judge must always be patient and fair, we think the appellant was not denied a fair trial by those exchanges between the trial judge and counsel for appellant and there was no reversible error therein.

II.
Did the trial court err in grating State's Instruction S-4 and in refusing appellant's Instructions D-2, D-3, D-4 and D-5?
The Instruction S-4 follows:
"The Court instructs the jury that self-defense is not a defense to the crime charged in the indictment in this case, and self-defense should not be considered by you in determining your verdict."
The Instructions D-2, D-3, D-4 and D-5, requested by appellant, were self-defense instructions. The appellant contends that his sole defense was self-defense and, since the trial court gave a peremptory instruction that self-defense could not be interposed in the case and declined his requested instructions on self-defense, he was practically denied any defense in the case.
The question which arises from the instructions mentioned is whether or not, taking all the facts favorable to appellant, together with all reasonable inferences, there was an issue for the jury to determine on self-defense. The trial judge, in granting the Instruction S-4 and denying the defense instructions requested by appellant, stated:
"It is the court's opinion that the defendant did not have reasonable grounds to believe from the evidence of this case that Fred Tisdale was about to fire at the defendant or that the defendant acted under the facts of this case in necessary *1286 self-defense nor do the facts make an issue on the defense of self-defense."
The proof is uncontradicted that the altercation originated between Eddie Ray Parker and Tisdale, and when they met the second time at the courthouse, Tisdale shot Eddie Ray Parker, who returned to fire and wounded Tisdale. At that point, Tisdale fled into the courthouse while appellant went to his brother's automobile, obtained a 30-30 rifle, and pursued Tisdale toward the courthouse.
Appellant was asked why he shot at Tisdale and he said, "Because he had pointed a gun at me earlier, shot my brother and had shot at me when he was coming toward the courthouse and I was pursuing him."
If a person provokes a difficulty, arming himself in advance, and intending, if necessary, to use his weapon and overcome his adversary, he becomes the aggressor, and deprives himself of the right of self-defense. Woods v. State, 183 Miss. 135, 183 So. 508 (1938).
Admittedly, with few exceptions, the right of self-defense should not be excluded where the evidence indicates a violent situation and harm to the parties. In Coleman v. State, 179 Miss. 611, 176 So. 714 (1937), the Court said:
"The law is that she must have armed herself for the purpose of provoking the difficulty and overcoming opposition if necessary. If the purpose to overcome opposition arose after the arming, the right of self defense is not cut off. [Citations omitted]. 179 Miss. at 664-665, 176 So. at 714.
In Pulpus v. State, 82 Miss. 548, 34 So. 2 (1903), the Court stated the rule with reference to an aggressor who withdrew from the fray as follows:
"One may provide himself with a deadly weapon and hunt another, with design to kill him with it, and provoke and be the aggressor in the encounter in which he kills the other, and still, in the progress of the difficulty should not be denied the right of self-defense, if the killing be not pursuant to the original purpose to kill. If he abandon the conflict, and is fleeing from it in good faith, and not for vantage, he may defend, himself from threatened death or great bodily harm. Lofton v. State, 79 Miss. 723, 734, 31 South. 420." 82 Miss. at 555, 34 So. at 3-4.
Although the trial judge should be extremely cautious in denying the defense of self-defense, on the facts of this case, we are of the opinion that the lower court correctly instructed against self-defense.
We have examined the other assignment of error and find no merit in it. Therefore, the judgment of the lower court is affirmed.
AFFIRMED.
PATTERSON, C.J., SMITH, and ROBERTSON, P. JJ., and SUGG, WALKER and BOWLING, JJ., concur.
HAWKINS and BROOM, JJ., dissent.
HAWKINS, Justice, dissenting:
The dissent which I respectfully register is based upon the refusal of the trial judge to grant any of the quite proper instructions requested by the defendant that he fired his weapon in lawful self-defense,[1] and even before more serious, in positively instructing the jury:

*1287 ... self-defense is not a defense to the crime charged in the indictment in this case, and self-defense should not be considered by you in determining your verdict.
In making a determination as to the propriety of this action by the trial court, it is necessary to review from this record evidence supporting the justification of instructions based upon self-defense.
The defendant John Wesley Parker (Parker) was indicted by the grand jury of Claiborne County of the crime of feloniously shooting a rifle into the Clairborne County Courthouse, a building occupied by people, and being a building usually occupied by persons. This indictment was under Miss. Code Ann. § 97-37-29 (1972).[2]
The jury returned a verdict of guilty, and recommended leniency. Upon this conviction, he was sentenced to serve a term of 10 years, with 5 years suspended. From this conviction he prosecuted this appeal.
Around noon on Thursday, January 3, 1980, the defendant Parker went to the courthouse in Port Gibson to find Roosevelt Yarbrough, a member of the Board of Supervisors, to talk about a debt of approximately $500.00 Yarbrough owed Parker's wife, and which had been due about two and one-half years. Parker had already sought without success the assistance of three justice court judges to collect this debt. Parker at the time had been laid off from work, and was needing the money.
Parker and Yarbrough got into a heated argument, but apparently Yarbrough promised to pay him at the police station, where the justice court judge (also serving as a policeman in Port Gibson) maintained his office. Yarbrough left the building and got into a pickup truck with one Fred M. Tisdale.
Following this conversation with Yarbrough, Parker  one of 12 children  met his brother Julius Parker in the courthouse. Julius Parker had come to the courthouse to see about a tag for his car.
The two brothers were leaving the courthouse together, and observed Yarbrough and Tisdale in the pickup. Parker turned from going to his car, and walked toward the passenger side of Tisdale's truck where Yarbrough was seated to tell Yarbrough he would see him at the police station where Yarbrough was supposed to pay him.
Before Parker reached the truck, Tisdale stepped out of the truck with one foot on the ground, and pointed a revolver at Parker. At that moment Julius Parker stepped in front of Parker and Tisdale said, "Turn him loose, I'll kill him."
Parker's mother, Lettie Parker, was also at or near the courthouse and saw Julius get in front of Parker. She yelled "J.W.," following which Parker, his brother Julius, and Lettie Parker got into her pickup truck and drove off.
Parker told his mother he wanted to go by the "police office" because Tisdale had pulled a gun on him. Lettie Parker suggested they first go home and talk to Leroy Parker, the father. Following this conversation, Parker, Julius, and their mother Lettie Parker drove to the Port Gibson police station. Tisdale was also there and again threatened Parker, calling him "nigger" and "bastard" and telling him he would kill him.
Parker made a criminal affidavit against Tisdale, for pointing and aiming a deadly weapon. While at the police station the Parkers were informed Tisdale was going to make a criminal affidavit against Parker. Parker and his mother then went to Sheriff Dan McKay's office to get an evaluation of Parker's property to use in posting bond for Parker. Julius Parker did not accompany the two, leaving instead for his job.
Eddie Ray Parker, another brother, had heard at his parents' home about the prior difficulty that day, and went to the courthouse to see Mrs. Velma Barnes, a county *1288 official. He was armed with a revolver. After talking with Mrs. Barnes he met Parker and his mother in the courthouse, and his mother asked Eddie Ray to take Parker home, which he agreed to do. Eddie Ray heard someone yell, "Here come Fred Tisdale and he's mad."
As the two brothers left the courthouse they observed Tisdale sitting in the right side of his pickup, the door opened, and his feet on the ground. Tisdale made a grossly obscene as well as threatening statement to them, and Parker (who was unaware Eddie Ray was armed) grabbed Eddie Ray by the shoulder and told him to come on because Tisdale had a gun. The police officer at Port Gibson had previously informed Parker he failed to take Tisdale's gun at the police station, giving Parker as his reason therefor, "It was not loaded."
The brothers headed for Eddie Ray's car, and while Eddie Ray was attempting to find his keys, he told Parker that Parker's rifle, which Eddie Ray had previously borrowed for hunting purposes, was in the trunk of the car.
The record is not clear whether the brothers had got into Eddie Ray's car, but both testified Tisdale without provocation or warning shot three times, with one shot hitting Eddie Ray in the leg. Eddie Ray limped behind a truck and shot three times at Tisdale. The record is not clear whether either of the brothers knew Tisdale was wounded by one of the shots from Eddie Ray's revolver.
Parker then attempted to locate the key to the trunk to get the rifle out of the car. As he was removing the rifle he saw Tisdale approaching the steps of the courthouse. Tisdale looked back, saw Parker and shot at him one time.
According to Parker, he "fell and ducked the shot."
Parker started towards the window of the courthouse and saw Tisdale through a window, pointing the revolver at him. He heard a shot and then fired the rifle twice into the window where Tisdale was standing. He testified he was shooting at Tisdale.
The majority opinion justifies the action of the trial court in removing from consideration by the jury the question of self-defense with the contention Tisdale had withdrawn and Parker was pursuing him. Here is all the record reveals on this issue:
Q Why were you shooting at Fred Tisdale in the Courthouse?
A Because he had pointed a gun at me earlier, shot my brother and had shot at me when he was coming towards the Courthouse and I was pursuing him.
Q Did you see Tisdale when you first walked up there in front of that window?
A No, I couldn't see him when I first walked up there.
Q And what happened then?
A I took a good  when I first see him I wasn't exactly close to the window. So when I approached to the window I could see him at that window with that gun leveled on me.
Q All right. What did you do  did you do anything before he fired?
A No.
After shooting into the window where Tisdale was standing, Parker turned and went back toward the car. Asked if he was scared with his back to the courthouse, Parker replied, "I didn't have no idea."
Parker testified he was going towards the courthouse, and that Tisdale was going away from him, but he added, also that Tisdale shot at him at that time. He admitted he was angry, and testified the police would give no protection. He testified that after Tisdale shot at him and he fell, when he got up and saw Tisdale he started shooting. Parker clearly testified that before he ever shot at Tisdale through the window, he first observed Tisdale standing there with the revolver pointed at him, and heard a shot from within the building.
Tisdale likewise testified he was at the window when Parker fired. Sheriff Daniel Lucas observed Tisdale at the window through which Parker fired. Two disinterested *1289 witnesses, Flora Mays and Velma Barnes observed Tisdale at the window with the revolver pointed outside. Barnes thought she heard a shot fired from within the courthouse. Mays heard Officer Lucas yell, "Tisdale, Tisdale, don't do that." Barnes was asked the question was Tisdale lying in ambush for Parker, and replied, "Yes, he was."
No one was injured from the shots fired by Parker. Tisdale and Eddie Ray Parker were separately indicted for aggravated assault by the grand jury of Clairborne County as a result of their activities that day, and both were convicted in the circuit court at that county.
As first noted in this dissent, the trial judge refused instructions based upon self-defense requested by Parker's counsel. Far more egregious, he positively instructed the jury self-defense was not a defense, and should not be considered by the jury in reaching their verdict.
The beleaguered trial judge  faced with a most serious problem in establishing and maintaining law and order following a lamentable episode there at the seat of justice of a county in his district  understandably could err. Trial judges frequently lack the time as well as the means to give full deliberation on vital issues of law and fact.
This Court is not thusly handicapped.
With profound deference to my colleagues, I must asseverate the denial by this Court of this man's right to have the issue of self-defense determined by a jury constitutes judicial usurpation of the lawful function of the jury, in my opinion, and is incomprehensible to me.
According to the defendant Parker, in testimony in which he received substantial corroboration in this record, he fired at Tisdale, standing behind the window in the courthouse, and who was the man who had:
(a) as an intermeddler pulled a revolver on Parker less than two hours previously, and threatened to kill him;
(b) shot Parker's brother only moments previously;
(c) shot at Parker while he (Tisdale) was running to seek cover in the courthouse; and
(d) at that very instant was aiming the pistol at him from behind the window, and he heard a shot from within the courthouse.
Then Parker fired twice through that window beyond which he saw Tisdale.
This decision represents a radical departure from all past decisions.
I do not believe either Woods v. State, 183 Miss. 135, 183 So. 508 (1938), or Pulpus v. State, 82 Miss. 548, 34 So. 2 (1903), the two cases cited by the majority opinion, support the propriety of an instruction which tells a jury positively self-defense should not be considered by them as a defense, because in both these cases the jury, upon instructions given by the trial court, did consider the factual issue of self-defense. In neither of them was the defendant denied the right of having the jury consider whether or not he acted in lawful self-defense.
Rather, both these cases illustrate a long standing  and to me salutary  policy of this Court of being particularly chary, and especially reluctant to grant even so much as an instruction for the State that tells the jury that in its wisdom it may not, not that it should not (as in this case), consider self-defense as a lawful defense in the case.
For example, in Patrick v. State, 285 So.2d 165 (Miss. 1973), this Court held that an instruction to the jury informing it, "... that you may find that the killing of Jerry Walley was not done in self defense" (emphasis added), was reversible error.
In Craft v. State, 271 So.2d 735 (Miss. 1973), Ellis v. State, 208 So.2d 49 (Miss. 1968), Tate v. State, 192 So.2d 923 (Miss. 1966), Vance v. State, 182 Miss. 840, 183 So. 280 (1938), and most recently in McMullen v. State, 291 So.2d 537 (Miss. 1974), this Court held similar instructions error.
I would also respectfully suggest that in each of the above cited cases, the conduct of the defendants as set forth in the opinions came nearer to justifying the instruction *1290 condemned than the facts of this case. But, at least in those cases the jury was permitted to consider the factual question of whether or not the defendant had acted in lawful self-defense. The issue was not extracted from their consideration by a positive instruction of the court.
In Patrick v. State, this Court stated, in order to justify such an instruction on behalf of the state, the evidence must show:
The unlawful act must be one that is calculated and intended to provoke a difficulty or encounter wherein the accused is afforded the opportunity to and does slay his adversary... . (emphasis added) 285 So.2d at 169.
In Prine v. State, 73 Miss. 838, 19 So. 711 (1896), quoted with approval in Patrick v. State, stated the pre-requisites for such an instruction. We need only quote some of them:

He (the defendant) must have been the originator of the difficulty; he must have entered it armed, and he must have so brought it on and entered into it intending to use his pistol, and overcome his adversary, if necessary, in the course of the encounter. (emphasis added)
Where are the ingredients of Patrick and Prine in this case?
In Garner v. State, 93 Miss. 843, 47 So. 500 (1908), the defendant was convicted of assault and battery with intent to kill and murder. In that case the defendant and one Clark had a fight, and being separated, the defendant went home for his gun, and returned to the scene of the difficulty looking for Clark. Clark appeared from a restaurant and opened fire on the defendant. The defendant returned the fire, several shots were exchanged and Clark was wounded. This Court held an instruction reducing the right of the defendant to claim self-defense as a defense was "manifestly erroneous." The Court further held the following instruction requested by the defendant proper:
The court instructs the jury that danger should apparently be imminent, yet it is not essential that it should be immediate and impending at the very moment of the shooting; so that, even though you may believe from the evidence in this case that the danger to the defendant was only apparent, and not imminent, yet if it appears to you that the danger was apparent to the defendant at the time of the shooting, then you must find the defendant not guilty, provided you believe that the shooting was not done in pursuance of his original intention to kill, if such ever existed, but shot because he was then in danger of losing his own life.
Id. at 844, 47 So. at 500-01. The Court went on to hold that the trial court's addition of the words, "without fault in himself in bringing on the difficulty," was erroneous.
One of the wisest statements on the question of even so much as giving the state an instruction which impinges on the right to claim self-defense is contained in Lofton v. State, 79 Miss. 723, 31 So. 420 (1901). In that case, following an argument with the deceased, the defendant told the deceased he would see him later, then went home a mile away and got his gun. Seeing the deceased in a wagon the defendant yelled at him, and the decedent jumped out of his wagon on the side toward the defendant, whereupon the defendant shot and killed the decedent instantly.
The state was given an instruction to the effect if they believed the defendant was the aggressor, then he could not plead self-defense.
The Court's language on this question needs to be quoted entirely:
But the third instruction for the state is fatally erroneous, in attempting to inform the jury when the defendant would be estopped to plead self-defense, without including all the elements of fact essential to the estoppel. There is irreconcilable conflict between not only the defendant's testimony and the state's, but (as to the stick) between the other witnesses for defendant and those for the state. If the defendant and his witnesses are to be believed, then the killing was in self-defense; and the defendant had a right to *1291 have instructions presenting his theory of the case, and ought not to have been deprived of that right by a charge, based on part only, of the testimony, declaring him to be estopped from pleading self-defense. There is no evidence at all in this record as to what his purpose was in procuring the gun, except his own, and that shows a lawful purpose. There is none that he procured it with the intention of using it in a difficulty which he intended to provoke, if necessary to overcome his adversary in that difficulty, and that that purpose and intention he retained up to and through the combat. And yet the charge is framed as if there were facts proven on which the jury might so find, and hence hold him estopped to plead self-defense. This form of charge, declaring a defendant estopped to plead self-defense, is an exceedingly unwise one to be given. We have repeatedly condemned it, as shown by cases cited in the very able brief of counsel for appellant. It can never be proper, save in the few very rare cases where the case is such, on its facts, that a charge can be given embracing all the elements  not part of them, nor nearly all of them  essential to the estoppel. The old paths are the safe paths. The juries of the country can be safely trusted to find any defendant guilty whose case is really so bad as to estop him to plead self-defense, without resort  dangerous and unwise  to the metaphysical subtleties necessarily involved in the preparation of a proper charge of that sort. Once more we repeat (hoping that "here a little and there a little, line upon line, and precept upon precept" may at last do their work) that if prosecuting attorneys will ask few and very simple charges, and trust more to the common sense and sound judgment of the juries of the country, they will expose their circuit judges to far less risk of reversal, secure just as many convictions, and have far  very far  fewer cases reversed.
Id. at 733-34, 31 So. at 420-21.
In Coleman v. State, 179 Miss. 661, 176 So. 714 (1937), there was a card party attended by the defendant and the deceased. There was an argument, following which the defendant procured a pistol from another person's suitcase and shot and killed the decedent. The defendant was also shot through the hand by someone else at the festivity. The opinion of the Court in that case is as follows:
The theory of the state was that appellant armed herself with the pistol for the purpose or provoking a difficulty with Sharp, and, if necessary to overcome him, to use, and therefore under the law, she was cut off from the right of self-defense. The court undertook to embody that theory in the following instruction: "The Court further instructs the jury for the state that if you believe from the evidence in this case beyond reasonable doubt that the defendant, Annie May Coleman, at a time when she was not in any immediate danger, real or apparent, of losing her life or suffering some great bodily harm at the hands of Ezekiel Sharp, armed herself with a deadly weapon and provoked a difficulty with Ezekiel Sharp and engaged in such difficulty in which the said Ezekiel Sharp was killed, then the defendant cannot plead self defense."
The instruction is fatally defective in that there is left out of it appellant's intention in arming herself. The law is that she must have armed herself for the purpose of provoking the difficulty and overcoming opposition if necessary. If the purpose to overcome opposition arose after the arming, the right of self-defense is not cut off. Thomas v. State, 61 Miss. 60; Long v. State, 52 Miss. 23; Allen v. State, 66 Miss. 385, 6 So. 242; Helm v. State, 67 Miss. 562, 7 So. 487; Ross v. State, 158 Miss. 827, 131 So. 367. The instruction was calculated to mislead the jury.
Id. at 664-65, 176 So. at 714.
Where is there any proof in this record that when the defendant procured the rifle from the truck he was doing anything other than attempting to protect both himself and his brother? Where is there any proof *1292 that in securing the rifle the sole reason therefor could only have been to search out and shoot Tisdale?
In the absence of such proof, the state was not even entitled to an instruction which restricted the claim of self-defense of the defendant.
Yet even in all the cases cited the defendants at least were granted jury instructions based upon self-defense. No defendant was totally denied all requested instructions based upon self-defense. Those defendants' invariable complaints to this Court was an instruction given to the jury at the request of the state which informed the jury the circumstances under which the defendant could be estopped to plead self-defense.
This Court has said time and time again that it is only in an exceptional few and rare instances that such an instruction should be granted the state. The record in this case lacks the pre-requisites to grant even an instruction that the jury might consider the defendant estopped to plead self-defense.
A far more grievous error, in my humble judgment, is being committed.
The solemn right to have a jury consider whether or not an act was done in self-defense, vouchsafed to us by our forefathers, inexplicably has been denied this defendant in this case.
BROOM, J., joins in this dissent.
NOTES
[1] Defendant's requested instruction D-4 reads as follows:

Self-defense is a defense to the commission of the crime of shooting into the Claiborne County Courthouse, an occupied building, provided that Fred Tisdale did make an unwarranted and unjustified attack upon the Defendant, John Wesley Parker, by shooting or aiming a pistol at him from the Clairborne County Courthouse, thereby giving the Defendant, John Wesley Parker, reasonable grounds to apprehend a design on the part of Fred Tisdale, to kill him or do him some great bodily harm, and there was imminent danger of such design being accomplished, and the Defendant, John Wesley Parker's use of force in repelling said attack was no more than reasonably necessary for his own protection.
If the State has failed to prove from the evidence in this case beyond a reasonable doubt that the Defendant did not act in self-defense, then you shall find the Defendant, not guilty.
[2] Under the facts of this case, it is questionable whether Parker was indicted under the proper charge, aggravated assault upon one Fred M. Tisdale being the correct charge, assuming the state's theory of the case was believed by the jury. Miss. Code Ann. § 97-3-7(2) (Supp. 1980). This question is not before us, however.