482 So.2d 1136 (1986)
Levi WILLIAMS
v.
STATE of Mississippi.
No. 55948.
Supreme Court of Mississippi.
January 29, 1986.
*1137 Mitchell M. Lundy, Sr., Lundy & Lundy, Grenada, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and HAWKINS and ANDERSON, JJ.
HAWKINS, Justice, for the Court:
This is an appeal by Levi Williams from his conviction in the circuit court of Grenada County of assaulting and shooting Ben Handy, Jr., and sentence to serve seven years.
Because of an erroneous instruction granted the state, we reverse.

FACTS
Levi was married for several years to Carolyn Powell Williams. They separated and eventually divorced in the latter part of 1983. While they were separated, Carolyn and Ben began living together in the Marascalco apartment complex in Grenada, and after the shooting detailed below, they married.
Around 3:30 p.m. on April 28, 1984, Levi went to the apartment to see Ben. He was armed with a .38 caliber revolver.
Although Carolyn was an eyewitness to all the events transpiring in the apartment, she was not called as a witness.
We will relate the facts as testified by Ben, and the uncontradicted testimony of Levi. These two provide the sole record of what happened there in the apartment.
Levi knocked and Carolyn went to the front door. She was not fully dressed and after she opened the door enough to see it was Levi, she went to the bathroom and got her robe. In doing so, she told Ben that "Muck" (Levi's nickname) was at the door. Carolyn returned to the front door with Ben following her.
In Ben's presence Levi asked them if he could speak with Carolyn. Ben told him it would be all right, and returned to the bedroom. Then Carolyn came to the bedroom and told Ben that Levi wanted to speak to him.
Ben went to the front door and asked Levi what he wanted. Levi said nothing, Ben told Carolyn he must have wanted to talk to her, and again went to the bedroom. Then Carolyn and Levi walked to the bedroom, and Levi sat in a chair. Ben was lying on the bed.
Ben testified as follows:
Q. What happened when he came into your bedroom?
A. He said he wanted to speak to me in private or something. I really wasn't listening at what he was saying cause I didn't want to hear nothing he had to say no way.
Q. All right. What happened?
A. And I told him then, I said, "Naw, the best thing for you to do is get on out of my house cause you're not nothing but a big liar nohow [sic]." I said, "The best thing is to just get out of my house." Just like that. And so I went  then she said,  she told him, she said, "Come on, Muck, leave," just like that, and so I followed  I went and pushed him and I said, "Go on and get out of the house," just like that.
Q. You say you called him a liar?
A. A liar.
Q. Was that something about what he said in the apartment?
A. That's right.
Q. What had he said in there that caused you to say that?
A. Said I know something about his girlfriend or a divorce or something. I *1138 really wasn't getting it all, but he mentioned girlfriend or lady or something, and I wasn't getting it all cause I didn't want to hear it.
Q. Where was he talking about a girlfriend or a lady?
A. He was right along in here, coming right along in here. (Indicating) And I told him, I said, "Naw, I don't want to hear it cause you ain't nothing but a big liar anyway," I said, "Take it on and get out of my house." That's what I said.
Q. What did your wife say to him?
A. She said, "Naw, Muck, come on, let's go," and he wanted to steady stop, and I said, "Naw, let's get on out of the house." And he went to that door, came along right through here and went on and then he came to this door right here and he stopped right there. And I said, "Naw, let's go on and get out of my house," just like that.
R.25-27.
Levi left the bedroom and was in the hallway just next to the front room. He was hesitant about leaving and Ben again testified as follows:
A. He stood there, and he said he wanted to talk. I said, "I don't want to talk to you," and then Carolyn went to say something, and I said, "Naw, you just get on back out of the way." I said, "The best thing to do, Man, is get on out of my house," just like that. And I went to push him and he fell on me and I went to push him out of the door, pushed him halfway out of the door, the other foot out of the door, and he staggered into here, went to staggering back, and he reached for his gun, and that's when I hit him and knocked him on out the door.
R.28.
Ben then went to the bedroom and got his pistol. He went back in the hallway and attempted to fire it, but it snapped. Levi then shot Ben in the cheek.
Ben testified he had told Levi three times to leave, but he was hesitating as Carolyn was leading him out. Ben testified that Levi asked his permission to speak to Carolyn. He also testified that Levi acted like he was drunk, although he could not smell anything on him, "but he was strange  he was just in a daze like or something."
Levi testified that he wanted to talk to Ben because he was "always hassling" him "trying to sue me for a car, and I went by to talk to him. All I wanted was some peace." He also said he armed himself in the event he had trouble with Ben, that he knew Ben had a temper and always had a gun.
Levi testified that as he was leaving, Carolyn tried to say something, when Ben shoved her and told her, "get out of the g____ d____ way."
At trial, and over defense objection, the state was granted the following instruction:
INSTRUCTION S-3
If you believe from the evidence in this case beyond a reasonable doubt that the defendant, Levi Williams, at a time when he was not in any immediate danger, real or apparent, of losing his life or suffering serious bodily harm at the hands of Ben Handy, Jr., armed himself with a deadly weapon and thereafter provoked and entered into a difficulty or encounter with Ben Handy, Jr., intending at the time that he armed himself and entered into such encounter, if any, to use the deadly weapon and overcome any resistance of Ben Handy, Jr., if necessary, in the course of the encounter; and if you further believe from all the evidence in this case beyond a reasonable doubt that the defendant never attempted in good faith to withdraw from the encounter and abandon his original purpose and intent, then the defendant cannot claim or rely on self-defense.
R.122.

LAW
Because this case must be re-tried, we do not attempt to relate all the evidence. Suffice it to say that, giving the state the benefit of all the evidence adduced in its favor, and squeezing all favorable inferences *1139 therefrom, there was no evidence to support this instruction. This is a classic case of disputed facts on self-defense in which this issue can and should be presented to the jury by conventional self-defense instructions.
We have repeatedly held that it is only in the most unusual of cases that an instruction such as this should be given. While Levi's arming himself with a revolver and going to the home of his former wife and her current boyfriend was indicative of a purpose to start serious trouble, the record in this case shows that Levi initiated no physical violence in any manner in Ben's and Carolyn's apartment. He made no threatening gestures to Ben except when he was shoved. Ben may or may not have had excellent reason to be shoving Levi out of his house, but this is for a jury to pass upon. Levi did not shoot Ben until Ben's pistol snapped in his effort to shoot him. Our views on an instruction such as this were amply set forth by Justice D. Lee, speaking for the Court, in Barnes v. State, 457 So.2d 1347 (Miss. 1984), and there is no need to repeat them here. This type of instruction has been repeatedly condemned in a long list of cases. For example, see: Barnes v. State, supra; McMullen v. State, 291 So.2d 537 (Miss. 1974); Patrick v. State, 285 So.2d 165 (Miss. 1973); Craft v. State, 271 So.2d 735 (Miss. 1973); Ellis v. State, 208 So.2d 49 (Miss. 1968); and Tate v. State, 192 So.2d 923 (Miss. 1966). See also: Thompson v. State, 190 Miss. 639, 200 So. 715 (1941); Brown v. State, 186 Miss. 734, 191 So. 818 (1939); Vance v. State, 182 Miss. 840, 183 So. 280 (1938); Coleman v. State, 179 Miss. 661, 176 So. 714 (1937); Lee v. State, 138 Miss. 474, 103 So. 233 (1925); Adams v. State, 136 Miss. 298, 101 So. 437 (1924); Garner v. State, 93 Miss. 843, 47 So. 500 (1908); Pulpus v. State, 82 Miss. 548, 34 So. 2 (1903); Lofton v. State, 79 Miss. 723, 31 So. 420 (1902); and Prine v. State, 73 Miss. 838, 19 So. 711 (1896).
In only two cases have we approved this instruction, Hall v. State, 420 So. 1381 (Miss. 1982), and Reid v. State, 301 So.2d 561 (Miss. 1974).
Other errors are assigned based upon the exclusion of evidence proffered by the defense. No error was committed by the circuit judge in sustaining the objection by the state to the evidence as sought to be elicited.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.