301 So.2d 561 (1974)
Daymon REID
v.
STATE of Mississippi.
No. 48059.
Supreme Court of Mississippi.
October 14, 1974.
Rehearing Denied November 4, 1974.
Barnett, Montgomery, McClintock & Cunningham, Jackson, Osborn G. Idom, Tom S. Lee, Forest, for appellant.
A.F. Summer, Atty. Gen., by Karen Gilfoy, Sp. Asst. Atty. Gen., Jackson, for appellee.
INZER, Justice:
Appellant Daymon Reid was indicted by the Grand Jury of Scott County for murder of Eugene Wolf. He was tried and convicted of manslaughter and sentenced to serve a term of twenty years in the State Penitentiary. From this conviction and sentence, he appeals. We affirm.
The evidence on behalf of the state established that about 3:00 p.m. on July 30, 1973, appellant shot and killed Eugene Wolf. At the time of the shooting Wolf was seated in a booth in a small camping trailer used by Douglas Carpenter as an office for a nursery in Forest, Mississippi. Douglas Carpenter testified that on the afternoon in question he and Wolf were seated in the trailer which was facing north. The door to the trailer was near the east end of the trailer and immediately to the right of the door was the booth where they were seated. Wolf was sitting across a small table from Carpenter facing west. At the time appellant approached the trailer Wolf had a needle in his hand which was used to sew burlap around nursery stock. Carpenter said that as appellant approached the trailer he saw the imprint of a gun under the T-shirt that appellant was wearing, and he told appellant not to bring that gun into the trailer. Appellant *562 made no reply and walked up to the trailer and stepped into it with his left foot, and his right foot was on the step. Upon entering the trailer appellant asked Wolf if he had his .38 pistol. When Wolf replied that he did not need a .38, appellant pulled his gun and shot Wolf. Carpenter said at the time Wolf was shot he was just sitting there with the needle in his right hand and that he never made any attempt to get up out of his seat. Wolf was shot one time under his left eye and fell back on the seat where he was sitting. Appellant then laid his pistol on the top of the table just to the left of the door and told Carpenter to go tell the men to come and get him. On cross examination Carpenter testified that the the time Wolf was shot that he had a knife in his right rear pocket but that he never at any time made any attempt to get the knife. He also stated that after the officers arrived they removed a .38 caliber pistol from the car of the deceased which was parked on the street near the trailer.
According to the testimony of appellant and his witness, Wolf was a much larger man than appellant and had a reputation of being a strong and violent man. Wolf had accused appellant of informing the sheriff that he had stolen a hay baler and had repeatedly threatened to kill appellant. Appellant's wife testified that on Friday prior to Monday, the day of the killing, Wolf had called her and told her that she would make a pretty widow. On Sunday night just prior to Monday at a time when her husband was not at home, Wolf's car pulled up in her driveway and stayed there about five minutes and then left. She also testified that about 1:00 p.m. on the day of the killing, she was driving with her two children on Highway 21 when Wolf drove up behind her. Wolf proceeded to bump her car several times until he was pushing her down the highway at a high rate of speed. She said that after this Wolf attempted to run her automobile off the road into a bridge, but she was able to avoid this. When she reached home she attempted to reach her husband by telephone to tell him about this incident. She then got her husband's pistol out of the bedroom and placed it in the console of the car and went to work. After she got to the place where she worked, she was able to reach her husband by telephone, and he came to her place of employment. When she informed him about what had happened he told her not to worry about it, it amounted to nothing. She said her husband then left about 2:00 p.m. in the car which still had the pistol in the console in order to have some new tires put on the car.
Appellant testified in his own behalf and he began his testimony stating that he had pleaded guilty to three counts of burglary at the age of eighteen in his home state of Alabama. He had received a three year sentence on each count and had actually served 34 months and 18 days of the sentence before he was paroled. He was married and had two children. He had lived in Scott County thirteen years. He testified that about ten days before the killing Wolf had accused him of informing the sheriff that Wolf had stolen a hay baler in Neshoba County, and on that occasion Wolf had threatened to kill him. After that several people had informed him that Wolf had told them that he was going to kill Daymon Reid. He said that on the day of the killing his wife called him and told him that she wanted to see him. When he reached the place where she was working, she told him about the incident of Wolf bumping her car and trying to run her off the road. He said he told her to forget all about it. He then decided to take the car that his wife was driving and go have some new tires put on it. When he got into the car he saw his pistol in the console. He was unable to get the tires put on that day and after buying some gasoline, he went to Marlar's Cafe and drank a cup of coffee. At that time he decided to go to see Douglas Carpenter in order to pay him $75 that he owed Carpenter for money that he and Billy Gunter had borrowed *563 from Carpenter to buy sugar that was used to make whiskey. He said when he arrived at Carpenter's place he saw Wolf's car and a pick up truck belonging to Carpenter parked there. He stopped his car and reached and got his pistol. He was wearing blue jeans, a T-shirt and cowboy boots. He stuck his gun in his right boot top. He said the reason that he got his gun was for protection. When he reached the trailer which was about eighteen inches above the ground with one step to enter the trailer, he stepped up the step with his right foot in the trailer and his left foot on the step. At that time Carpenter said "Hi, ya, boy," and about that time he looked to his right and saw Wolf sitting there on the left side of the seat against the east wall. Appellant said he never spoke to Carpenter but just nodded his head and turned and looked at Wolf. At this point appellant's testimony as revealed by the record is as follows:
Q. And what, if anything, did you or he say?
A. I asked him what did he mean and he just smiled at me and the next words that was spoken, I asked him did he have that .38 that he's been telling these people he was going to shoot me with.
Q. You quote his exact words now that he said at that time.
A. He looked at me, gritted his teeth and said, "I don't need no God-damn .38!"
Q. What did he have in his right hand at that time, if anything?
A. I thought he had a knife.
Q. Could you definitely tell it was metal or not?
A. Yes, I could tell it was a metal object.
* * * * * *
Q. When Mr. Wolf made that statement that he didn't need a .38, tell this jury whether or not you moved your body in any direction?
A. All I moved was my right hand because when he said, "I don't need no God-damn .38" he was in a half-up and halfway position coming out of that table with this instrument right here about six inches above the floor  I mean, above the table top trying to get out of that booth coming on me.
Q. Where was his left hand at that time?
A. His left hand was on the corner of the table trying to pull himself up.
Q. At that very moment approximately how far were you and he apart?
A. Approximately eighteen inches.
Q. And tell this Court and the jury whether or not he was looking at you at the time you pulled that pistol and fired.
A. He was looking straight at me trying to get up and I just pulled it out of the boot and pulled the trigger.
Q. Why did you pull the trigger, or pull your gun and pull the trigger on that occasion?
A. I didn't want him to get to me with that knife, which I thought that's what it was.
Q. After that what, if anything, did you say or do?
A. Well, when the gun fired Douglas jumped up and run out over me, I laid the gun on the stove and he run out in the yard and said, "Good God Almighty," and I told him to go call the men, told him to get somebody down there.
On cross examination appellant admitted that when he got out of his car he walked by Wolf's car but denied he saw Wolf's .38 caliber pistol that was on the seat. He also admitted that if he had stepped back out of the trailer he would have been completely out of the reach of Wolf.
Appellant's assignment of error is as follows:
1. The trial court committed fatal and reversible error in granting instruction number two for the state.

*564 2. The trial court committed reversible error in granting instruction number three requested by the state.
3. The trial court committed prejudicial and reversible error in allowing the state, over objections, to introduce repetitious pictures depicting the body of the deceased as such repetition of pictures was calculated and probably did prejudice and inflame the mind of the jury.
4. The verdict of the jury and the judgment entered is contrary to the overwhelming weight of the evidence and the law.
Instruction Number Two for the State reads as follows:
The Court instructs the jury for the State of Mississippi that the law of self-defense as defined in these instructions does not imply or grant the right to attack. If you believe from the evidence the Defendant armed himself with a deadly weapon and sought the deceased with the formed felonious intention of invoking a difficulty with the deceased, or brought on, or voluntarily entered into any difficulty with the deceased with the designed and felonious intent to kill and murder the deceased, then the Defendant cannot invoke the law of self-defense no matter how imminent the peril in which he found himself.
Relying on Craft v. State, 271 So.2d 735 (Miss. 1973), appellant urges that the granting of this instruction over his objection constitutes reversible error. In Craft and numerous other cases we have found that the granting of this instruction was error, but we have never condemned this instruction per se. We said in Craft:
It is a rare case indeed, and this is not one of them, in which it is proper to give an instruction to the jury cutting off the right of a defendant in a murder prosecution to defend himself. Under the facts in evidence the giving of either of the quoted instructions was fatally prejudicial and requires reversal of the conviction and a remand of the case for a new trial. (271 So.2d at 736).
We are of the opinion that this is one of those rare cases in which it was not error to grant this instruction. When appellant's own testimony is considered in its most favorable light, it reveals that appellant, seeing Wolf's car parked near Carpenter's trailer, deliberately armed himself with his pistol for what he says was self-protection. He proceeded to the trailer, and when he saw Wolf seated in this trailer, he immediately challenged him by asking, "What did he mean?" and did he have the .38 with which he was going to shoot appellant, as he had been telling people he was going to do. At this point appellant became the aggressor and according to appellant, Wolf reacted by saying he did not need any God-damn .38 and started to get up. At this time, appellant drew his pistol and shot Wolf. This is what appellant should have expected Wolf to do and probably what any man similarly situated would have done. It is in this case, as it was in Thomas v. State, 61 Miss. 60 (1883), under somewhat similar facts this Court said:
Viewed in the most favorable light for the defendant, his act in preparing his weapon for quick and easy access, and walking up to the deceased and calling out, when he had approached to within a few feet, "I am ready for you to shoot," was a challenge to fight with deadly weapons, an impromptu duel. It is impossible to place any more favorable construction than this upon such acts and words. He who slays another in a duel, whether formal or suddenly improvised, and however fairly conducted, is legally a murderer; but he who walks up behind an antagonist unaware of his presence and invites or challenges him to fight, and then shoots him in the back before he can turn or draw a weapon, is not a duelist, but an assassin. It is true that the defendant says that he shot because the deceased threw his hand behind him and thereby induced him to believe *565 that he was about to draw a pistol, but this was exactly what he had himself invited deceased to do and that which any man similarly situated and accosted would inevitably have done, if he was armed, under the first instinct of self-preservation. He who by his own conduct compels another to get ready for self-defense cannot claim that the responsive preparation has put his own life in danger, and thereby justified him in stopping the preparation by slaying him who was making ready for combat into which he had been forced. Taking the defendant's own testimony therefore as absolutely true, the verdict was manifestly correct, and any other would have been clearly against the law and the facts. (Emphasis added)
(61 Miss. at 66, 67).
See also Pitts v. State, 211 Miss. 268, 51 So.2d 448 (1951); Woods v. State, 183 Miss. 135, 183 So. 508 (1938); Durham v. State, 158 Miss. 833, 131 So. 423 (1930), and Stubblefield v. State, 142 Miss. 787, 107 So. 663 (1926).
Instruction No. 3 for the state has been approved in one form or another since the earliest days of our jurisprudence. While the instruction in the form given was not as complete as it could have been, when it is read with at least six instructions granted appellant announcing the law of self-defense, the jury could not have been misled by the granting of this instruction. Shinall v. State, 199 So.2d 251 (Miss. 1967); Poole v. State, 231 Miss. 1, 94 So.2d 239 (1957).
We find no merit in the assignment of error relative to admission of photographs of the deceased in evidence. The trial judge found that the photographs had legitimate evidentiary value. This was within his sound discretion, and we cannot say that he abused his discretion in so finding. In fact, we think the ruling was correct. May v. State, 199 So.2d 635 (Miss. 1967).
All we need to say relative to appellant's final assignment of error that the verdict of the jury is against the overwhelming weight of the evidence is that appellant is most fortunate that the jury did not find him guilty of murder. There was ample testimony to support such a verdict.
For the reasons stated, this case must be and is affirmed.
Affirmed.
GILLESPIE, C.J., and PATTERSON, SUGG and WALKER, JJ., concur.