420 So.2d 1381 (1982)
Willie James HALL
v.
STATE of Mississippi.
No. 53550.
Supreme Court of Mississippi.
October 27, 1982.
*1382 Lawyer & Hudson, Theodore J. Lawyer, Don W. Fredericks, Gulfport, for appellant.
Bill Allain, Atty. Gen. by Amy D. Whitten, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
SUGG, Presiding Justice, for the Court:
Willie James Hall was indicted for aggravated assault under section 97-3-7(2) Mississippi Code Annotated (Supp. 1981) for attempting to cause serious bodily injury to Willie James Bradley on July 24, 1980. Hall was convicted of aggravated assault and sentenced to serve a term of three years by the Circuit Court of the First Judicial District of Harrison County.
The principal question on this appeal is whether reversible error was committed by granting the state, over Hall's objection, the following instruction:
INSTRUCTION S-3
If you believe from the evidence the Defendant armed himself with a deadly weapon and sought the victim with the formed felonious intention of invoking a difficulty with the victim, or brought on, or voluntarily entered into any difficulty with the victim with the designed and felonious intent to cause serious bodily harm to the victim then the Defendant cannot invoke the law of self-defense.
The trial judge also granted the following instruction requested by Hall:
INSTRUCTION NO. D-5
The Court further instructs the Jury that the Defendant is entitled to act upon the reasonable appearances, and if the conduct of the other party was such as to induce in the mind of a reasonable person, situated as he was, under all circumstances then existing and viewed from the standpoint of the Defendant, a fear that death or great bodily harm was about to be inflicted by the other party on him, it does not matter if there was no actual danger provided that the Jury under the circumstances believe that the Defendant acted in self-defense based upon a belief that his life was in apparent danger, and if you so believe, you must find the defendant not guilty.
*1383 In order to determine whether the state's instruction was erroneously granted, it is necessary that we consider the evidence in detail.
Willie James Bradley testified that he was living with his mother and step-father on July 24 in their home. Before that date he had been living in a trailer owned by Hall and his wife located at the rear of the Hall residence which was rented from the Halls. At about 8:00 o'clock p.m. on July 24 the witness and his brother, Charles Bradley, went to Hall's house for the purpose of paying part of the rent due and in arrears. Hall was not present so the witness talked to Hall's wife and stated he had $65 to pay on the rent that day. Hall's wife refused to accept the payment stating that the witness would have to pay the full amount due. The witness estimated the rent due was about $190. He testified that he and Hall's wife talked for about thirty minutes and during the conversation his brother went to the trailer to remove some clothes. He stated that he did not use profane language during the conversation and that Mrs. Hall did not attempt to call the police while he was there.
About 10:30 or 11:00 o'clock the same night the witness was in the living room watching TV when he heard a knock on the door. His brother, Charles Bradley, was talking on the telephone and his mother and step-father were in a back bedroom. He stated he went to the door and when he opened the front screen door he saw Hall and invited him to come in. Hall refused and asked the witness to come outside.
As Hall turned to walk away the witness saw a bulk under Hall's clothes and believed that Hall was armed with a pistol whereupon he told Hall that he was not going to come out. The witness then went to the back bedroom to get his pistol but was prevented by his mother who told him she did not want any violence.
The witness then went outside to talk to Hall and was unarmed at that time. He stated he knew that Hall had come to the house to collect the rent due so he got $100 out of his wallet and went outside to give it to Hall. Hall was about 60 feet away from the front door and Willie asked him to come to the front porch and talk. Hall refused and asked Willie to come to the street and talk to him. This exchange of invitations was repeated several times. The witness said that he did not go to the street because he knew that Hall had a gun. The witness then moved from the front door to the carport and sat on the back of an automobile parked in the carport about six to ten feet from the front door. After the witness and Hall carried on a conversation while they were separated by approximately sixty feet for a short time, Hall obtained a shotgun from his vehicle and shot one time at the witness. The witness said the shot hit the gas tank, he "rolled off" the car, and ran around the back of the house. He stated that he ran to his cousin's house and heard a second shot while running around the back of the house. The next morning he discovered a hole in the front window of the house.
On cross-examination he denied that he carried a pistol with him when he went to Hall's house earlier that night.
Charles Bradley testified that he lived with his mother and step-father but before that had lived in the Hall's trailer with his brother Willie and another person. He and Willie went to the Hall house to pay a portion of the rent that they owed, and while his brother talked to Mrs. Hall, he went to the trailer to get some clothes. He did not hear the conversation between Mrs. Hall and his brother and first saw Hall that night when Hall came to his house. He corroborated his brother Willie to the effect that Willie was watching TV and the witness was talking on the telephone. He stated Willie opened the door, came back into the house and told him that Hall had a pistol. Willie went to the back bedroom to get his pistol but their mother would not let him have it. Willie returned to the door, went outside and Hall was about thirty *1384 yards away by his automobile. He overheard Hall and his brother talking, his brother kept asking Hall to come to the carport and talk, but Hall kept asking his brother to come out to the car to talk. The conversation ended when Hall got his shotgun out of his car and shot at his brother. Upon seeing this, the witness said he ran back into his house, and told his mother to go into the back room. The witness heard two shots, one of which went through a window in the front room of the house, the other into the gas tank of the automobile parked in the carport. His mother called the police and they arrived shortly after the shooting.
One of the officers called to the scene arrested Hall between two and three o'clock on the morning of July 25. He testified that he went to Hall's house, knocked on the door and informed Hall's wife that he had an arrest warrant for Hall. She advised him that Hall was not at home, but on searching the premises the officer found Hall in a bed in the front bedroom.
Hall testified that he had been convicted of an aggravated assault charge which was reduced to a misdemeanor when he was seventeen or eighteen and had been convicted for possession of marihuana. On July 24 he was working the second shift but left early after his wife came to his place of employment and told him that the Bradleys had been by the house and entered the trailer. He said he had told them not to go into the trailer because they were three months behind in their rent. He reported that his wife told him that the Bradleys had cursed her and that she was very upset.
He stated that his wife told him she called the police three times but they refused to respond to the call. He further testified that his wife told him that one of the Bradleys told her that they were going "to mess me up" if he went to their home. He then put his shotgun in the back of his car and went to the Bradleys' house. Upon arriving at the Bradleys' house he left the gun in the back of the car and knocked on the door. He said that Willie Bradley came to the door, he invited Bradley outside, but Bradley refused and invited him to come inside. He said he could then see Charles Bradley coming from the hallway with a gun at his side, whereupon he turned and went to his car. He said that he went to his car, opened the back door, obtained the shotgun, and fired it. He stated that his wife told him that the Bradleys had threatened her and had threatened him so he had taken his gun with him to protect his life. He denied having a pistol on his side. He stated Charles Bradley pushed the screen door open with his foot and he could see "the flashing silver gun in his hand." He testified that he then pulled his gun out and fired it into the ground twice in an effort to scare them and give himself a chance to leave.
After the shooting occurred, Hall parked his car at his sister-in-law's house which was separated from his house by three other houses. He said the reason he parked his car there was that he presumed they would call the police. He crawled in a window of his house and went to bed because he said he knew his wife was going to be upset because of what he had done. He also stated that his wife came to the Bradleys' house after he had been there a couple of minutes or so and that she left after he fired the shots.
Mrs. Hall testified that Willie came into the house and told her he had come to pay the rent but did not have all of the rent. She told him to wait until he could pay all of the rent and Willie started cursing and using profanity. She testified that they argued for a few minutes, and she told him that Charles was not supposed to take anything out of the trailer. She testified that she reported this incident to her husband and he went to the Bradleys' house and she followed her husband there. She stated that she called the police while Willie was there.
When she arrived at the Bradley residence, she saw her husband rushing back to *1385 his car and Charles standing in the door holding a pistol out to his leftside "like in a pointing manner." She drove off before she heard any shots. She said the police came to her house at 3:20 a.m. and she invited them in and told them to look for Willie but that he was not home.
On rebuttal Charles Bradley testified that he did not have a gun in his hand when Hall came to the house. Willie Bradley testified on rebuttal that he did not threaten Mrs. Hall in any way during the conversation at her home earlier in the evening. He also testified she did not call the police while he was there.
The custodian of the records for the Gulfport Police Department testified that there was no record of a call from Mrs. Hall on the night in question. She stated that if Mrs. Hall had made a call a complaint card would have been recorded.
The record is uncontradicted that Hall left his employment, armed himself with a shotgun, went to the Bradleys home after having been warned by his wife that they had threatened to "mess him up" if he came to the house, and after his wife reported to him that Willie Bradley had cursed her and threatened her earlier during the evening. In Parker v. State, 401 So.2d 1282 (Miss. 1981) we stated:
If a person provokes a difficulty, arming himself in advance, and intending, if necessary, to use his weapon and overcome his adversary, he becomes the aggressor, and deprives himself of the right of self-defense. Woods v. State, 183 Miss. 135, 183 So. 508 (1938).
Admittedly, with few exceptions, the right of self-defense should not be excluded where the evidence indicates a violent situation and harm to the parties. In Coleman v. State, 179 Miss. 661, 176 So. 714 (1937), the Court said:
"The law is that she must have armed herself for the purpose of provoking the difficulty and overcoming opposition if necessary. If the purpose to overcome opposition arose after the arming, the right of self defense is not cut off. [Citations omitted]. 179 Miss. at 664-655, 176 So. at 714.
In Pulpus v. State, 82 Miss. 548, 34 So. 2 (1903), the Court stated the rule with reference to an aggressor who withdrew from the fray as follows:
"One may provide himself with a deadly weapon and hunt another, with design to kill him with it, and provoke and be the aggressor in the encounter in which he kills the other, and still, in the progress of the difficulty should not be denied the right of self-defense, if the killing be not pursuant to the original purpose to kill. If he abandon the conflict, and is fleeing from it in good faith, and not for vantage, he may defend, himself from threatened death or great bodily harm. Lofton v. State, 79 Miss. 723, 734, 31 South. 420." 82 Miss. at 555, 34 So. at 3-4. (401 So.2d at 1286).
At issue in the case was whether Hall armed himself with a deadly weapon with the intention of invoking a difficulty or voluntarily entered into a difficulty with the victim with the designed and felonious intent to cause serious bodily harm to the victim. S-3 instructed the jury that Hall could not invoke the law of self-defense if he armed himself with a deadly weapon and was the aggressor. The instruction did not peremptorily estop Hall from claiming self-defense, but submitted the issue to the jury for its determination. This was a proper instruction under Parker and Woods, supra, and the evidence supported the instruction.
Moreover, Hall was given a self-defense instruction which permitted the jury to consider whether he acted in self-defense under all the circumstances then existing viewed from the standpoint of Hall. The instruction was obviously an attempt to instruct the jury in accordance with Lofton and Pulpus, supra, that although one arms himself with a deadly weapon and hunts *1386 another with the intent to provoke and be the aggressor in the encounter, the right of self-defense should not be denied if such person had abandoned the conflict and was fleeing from it in good faith, and not for vantage, but such person may defend himself from threatened death or great bodily harm. Instruction D-5 does not clearly express this principle of law, but the trial court cannot be put in error for Hall's failure to request an instruction correctly and fully stating applicable law. It is a familiar rule of law that one may not complain of his own instruction. Buford v. State, 372 So.2d 254 (Miss. 1979) and Musselwhite v. State, 212 Miss. 526, 54 So.2d 911 (1951).
The jury was presented with two questions by these instructions. First, whether Hall armed himself with a deadly weapon and sought his victim with the intent of invoking a difficulty and second, whether Hall had abandoned the conflict and was fleeing in good faith, in which event he could invoke the right of self-defense. The jury by its verdict rejected Hall's contention that he was fleeing in good faith. Therefore, we find no error was committed by giving Instruction S-3.
Hall also assigns as error that the verdict of the jury was against the overwhelming weight of the evidence and that certain remarks by the district attorney in his closing argument were prejudicial and inflamatory. We have carefully considered the arguments and authorities cited in support of these assignments, but find no merit in either of them.
AFFIRMED.
PATTERSON, C.J., WALKER, P.J., and BROOM, ROY NOBLE LEE, and PRATHER, JJ., concur.
HAWKINS, BOWLING and DAN M. LEE, JJ., dissent.
HAWKINS, Justice, dissenting:
I respectfully dissent. I would reverse and remand this case on the basis of the instruction granted the state and which estopped the defendant from claiming self-defense.
The majority opinion  without specifically informing the bench and bar that we are engaged in such undertaking  in effect overrules what I would have surmised a rather formidable (in both quantity and quality) array of decisions of this Court condemning such an instruction.
In deference, I would suggest that the only case cited by the majority which in fact supports its holding is Parker v. State, 401 So.2d 1282 (Miss. 1981). I expressed my thoughts as to Parker as best I could in a dissent. In my view, it is a modest defense of the present majority opinion that at least the error here is not as egregious as in Parker.
Hall was indicted for aggravated assault by attempting to cause serious bodily injury to Willie James Bradley on July 24, 1980.[1]
On July 24, 1980, Willie James Bradley and his brother, Charles, were renting a trailer from Hall and his wife, Jean Hall, and were behind in their rent. The brothers went to the trailer to discuss the rent and for Charles to get some of his clothes. According to the Bradleys, the discussion was uneventful; according to Mrs. Hall the Bradleys used profanity and made threats. The profane language was aimed at both her and her husband. Upset when they left, she telephoned Hall at his work and told him threats had been made against her as well as him. Hall went home and his wife told him that she had called the police. Hall testified that his wife warned him that one of them had stated they were going to "mess me up" if he went over there, presumably to the residence of the Bradleys' mother, where they had gone.
*1387 While he was at home, Charles Bradley called Hall on the telephone and told Hall he could come pick up the rent money.[2] Hall testified that the reasons he took his shotgun with him was because, "... they had threatened her and threatened me, at that time I put my gun in the car." Further, he stated in his testimony that, "I took it to protect my own life." On cross-examination he again testified, "I took the gun for my self-protection."
It is undisputed that when Hall went to the door of the Bradleys' mother's home, he did not have the shotgun in his hand. According to the Bradleys, after an argument between Hall and Willie James Bradley on the outside of the house, Hall got his shotgun out of the car and shot at Willie. Charles Bradley, who was at all times inside the house, testified he heard two shots. Both Bradleys testified they were unarmed, and from their testimony, Hall was in no danger, real or apparent, from either.
According to Hall, Willie James Bradley came to the door first and asked him to come inside. He further testified that he then saw Charles Bradley coming from the hallway in the house with a gun at his side. Hall described it as a silver gun. Hall testified that he then went to his car and got out his shotgun. Again according to Hall, when he turned around he saw Charles Bradley pointing the gun at him.
Hall said he then fired his shotgun to scare them, so as to give him a chance to leave. He believed the gun fired twice, "I pulled the trigger at the same time, I think both of the rounds came out at the same time." He testified that he was not firing at either one of the Bradleys.[3]
At the conclusion of the trial, the circuit judge over defense objections granted the following instruction to the State:
If you believe from the evidence the Defendant armed himself with a deadly weapon and sought the victim with the formed felonious intention of invoking a difficulty with the victim, or brought on, or voluntarily entered into any difficulty with the victim with the designed and felonious intent to cause serious bodily harm to the victim, then the defendant cannot invoke the law of self-defense.
Did the granting of this instruction constitute reversible error?
Once again this Court is faced with the question of the propriety of an instruction which tells a jury when an accused is precluded, or estopped, from asserting the claim of self-defense.
The law requires the existence of certain facts before an accused will be permitted to claim self-defense, in the first place, i.e., he must be in imminent peril, real or reasonably apparent, of loss of life or serious bodily harm at the hands of his assailant. Needless to say, any instruction on this issue should be carefully drawn.
There is another principle of law which provides, however: Even though the accused was in danger of losing his life at the hands of his assailant when he committed the criminal act, there are circumstances which will preclude, or estop him from asserting the claim of self-defense.
There is a considerable difference between the two concepts. Yet, they have been intertwined, and confusion has resulted.
To instruct a jury of the circumstances which must exist before the accused may claim self-defense is one matter. To instruct a jury, in effect, that even though an accused was in mortal danger, the circumstances under which his right to claim self-defense is cut off, is a far more difficult matter. Such an instruction, until this case, has been fraught with peril for the state.[4]
An instruction on this question has been even more perilous when given in the abstract. *1388 To lay out principles of estoppel in a criminal case involving self-defense purely in the abstract (as in this case) poses virtually insurmountable problems of being free from error. To give the jury no guide whatever as to the precise facts necessary as to when and when not to apply this principle of estoppel invites speculation and conjecture on the part of the jury as to its application.
This Court condemned outright the giving of any instruction precluding the defendant from asserting the claim of self-defense in the following cases: McMullen v. State, 291 So.2d 537 (Miss. 1974); Patrick v. State, 285 So.2d 165 (Miss. 1973); Craft v. State, 271 So.2d 735 (Miss. 1973); Ellis v. State, 208 So.2d 49 (Miss. 1968); Tate v. State, 192 So.2d 923 (Miss. 1966); Thompson v. State, 190 Miss. 639, 200 So. 715 (1941); Brown v. State, 186 Miss. 734, 191 So. 818 (1939); Vance v. State, 182 Miss. 840, 183 So. 280 (1938); Coleman v. State, 179 Miss. 661, 176 So. 714 (1937); Lee v. State, 138 Miss. 474, 103 So. 233 (1925); Adams v. State, 136 Miss. 298, 101 So. 437 (1924); Garner v. State, 93 Miss. 843, 47 So. 500 (1908); Pulpus v. State, 82 Miss. 548, 34 So. 2 (1903); Lofton v. State, 79 Miss. 723, 31 So. 420 (1902); and Prine v. State, 73 Miss. 838, 19 So. 711 (1896).
In Patrick v. State, supra, involving an instruction which was not altogether in the abstract, this Court stated:
This instruction is bad for several reasons. First, it does not accurately state the law in regard to when the right of self-defense may be denied to a defendant, and, second, it is couched in such broad and general terms that it could only serve to confuse the jury. Additionally, we reiterate and reemphasize what has already been said many times by this Court, and that is that it is a rare occasion when an instruction cutting off the right of self-defense is proper in a murder prosecution. Craft v. State, 271 So.2d 735 (Miss. 1973); Ellis v. State, 208 So.2d 49 (Miss. 1968); Tate v. State, 192 So.2d 923 (Miss. 1966). In fact, the Court has gone so far as to say that an instruction which cuts off the defendant's right to assert self-defense will be granted only where his guilt is so overwhelmingly manifest that no other verdict than guilty could probably be rendered. Tate v. State, 95 Miss. 138, 48 So. 13 (1909). In the recent case of Tate v. State, 192 So.2d 923, 924 (Miss. 1966), the Court quoting with approval from Lofton v. State, 79 Miss. 723, 31 So. 420 (1901) said:
"* * * This form of charge, declaring a defendant estopped to plead self-defense, is an exceedingly unwise one to be given. We have repeatedly condemned it, * * * It can never be proper, save in the few, very, rare cases where the case is such, on its facts, that a charge can be given embracing all the elements  not part of them, nor nearly all of them  essential to the estoppel."
The necessary elements which must be in evidence before an accused can be denied the right to assert self-defense were stated by Justice Woods in Prine v. State, 73 Miss. 838, 842, 843, 19 So. 711, 712 (1896) while discussing the propriety of instructions allowed to the State in that case:
The second and third instructions for the state are fatally erroneous. Both omit any reference to what was the state of Prine's mind; whether he had the murderous purpose formed at the time he provoked the difficulty, if, indeed, the jury should believe from the evidence that Prine first approached Chaine and brought on the difficulty. The jury might believe Prine was the aggressor, and brought on the difficulty, and that he entered it armed with a *1389 pistol, yet Prine was not cut off from the right of self-defense unless the jury should further believe from the evidence that Prine so brought on the difficulty, armed with a deadly weapon, and intending to use it when he provoked or brought on the encounter. He must have been the originator of the difficulty; he must have entered it armed, and he must have so brought it on and entered into it intending to use his pistol, and overcome his adversary, if necessary, in the course of the encounter. (Emphasis added).
Furthermore, it is not every wrongful act which provokes or brings on a difficulty that will deprive a person of self-defense. In Lucas v. State, 109 Miss. 82, 90, 67 So. 851, 852 (1915), it is stated:
"It is not every act of aggression or provocation which produces a difficulty, and in the course of which a necessity to kill another arises, that will preclude the slayer from availing himself of the right of self-defense; but it depends upon the character and quality of the act, and in some jurisdictions also upon the intent with which the difficulty was brought on." 21 Cyc. 806.
The unlawful act must be one that is calculated and intended to provoke a difficulty or encounter wherein the accused is afforded the opportunity to and does slay his adversary without the accused having, in good faith, abandoned his original intent.

285 So.2d at 168-69. (Emphasis added).
In McMullen v. State, supra, although the defendant made no objection at trial to such an instruction in the abstract, this Court recognized that the instruction was one of two which constituted "grave error," and reversed to prevent "manifest injustice." The factual background of the slaying was not set out in the opinion.
The only case in which such an instruction given in the abstract was not held to be reversible error was Reid v. State, 301 So.2d 561 (Miss. 1974). An entirely different factual situation existed in Reid than that found in this case. In that case, the defendant Reid claimed that he had been threatened by the decedent Wolf, and was driving by one Carpenter's trailer when he saw Wolf's car parked there. Armed with a pistol, Reid went into Carpenter's trailer where he observed Wolf and Carpenter seated at a booth. Reid testified that he asked Wolf what he meant, did he have "that .38 that he's been telling these people he was going to shoot me with." Reid testified further Wolf replied he did not need any .38, and started up, trying to get out of the booth to come on him, and said he thought Wolf was armed with a knife, "I didn't want him to get to me with that knife ..."
This Court stated:
In Craft and numerous other cases we have found that the granting of this instruction was error, but we have never condemned this instruction per se.

* * * * * *
We are of the opinion that this is one of those rare cases in which it was not error to grant this instruction. When appellant's own testimony is considered in its most favorable light, it reveals that appellant, seeing Wolf's car parked near Carpenter's trailer, deliberately armed himself with his pistol for what he says was self-protection. He proceeded to the trailer, and when he saw Wolf seated in this trailer, he immediately challenged him by asking, "What did he mean?" and did he have the .38 with which he was going to shoot appellant, as he had been telling people he was going to do. At this point appellant became the aggressor and according to appellant, Wolf reacted by saying he did not need any Goddamn .38 and started to get up. At this time, appellant drew his pistol and shot Wolf. This is what appellant should have expected Wolf to do and probably what any man similarly situated would have done.

301 So.2d at 564. (emphasis added).
This Court then quoted from Thomas v. State, 61 Miss. 60 (1883), but emphasized the following sentence therefrom:

*1390 He who by his own conduct compels another to get ready for self-defense cannot claim that the responsive preparation has put his own life in danger, and thereby justified him in stopping the preparation by slaying him who was making ready for [the] combat into which he had been forced.
301 So.2d at 565. Thomas v. State did not involve an instruction, but did enunciate the above principle of law.
The cases of Lewis v. State, 188 Miss. 410, 195 So. 325 (1940); Woods v. State, 183 Miss. 135, 184 So. 311 (1938); Durham v. State, 158 Miss. 833, 131 So. 422 (1930); Stubblefield v. State, 142 Miss. 787, 107 So. 663 (1926); and Helm v. State, 67 Miss. 562, 7 So. 487 (1890), have also approved an instruction estopping the defendant from pleading self-defense, but the instructions were not in the abstract. In all those cases the facts are patently distinguishable from this case.
The instruction in this case is subject to the same objections as set out in Patrick v. State, for it does not precisely state the law in regard to when the right of self-defense may be denied a defendant; it is in the abstract, and its terms can only confuse a jury.
Furthermore, there was no necessity for such an instruction. According to the State's version the defendant was in no danger, real or apparent, when he fired the shotgun. The usual instruction, or instructions, on self-defense would have sufficed in this case.
Years ago in Lofton v. State, supra, after condemning an instruction estopping the defendant from claiming self-defense, this Court stated:
This form of charge, declaring a defendant estopped to plead self-defense, is an exceedingly unwise one to be given. We have repeatedly condemned it, as shown by cases cited in the very able brief of counsel for appellant. It can never be proper, save in the few very rare cases where the case is such, on its facts, that a charge can be given embracing all the elements  not part of them, nor nearly all of them  essential to the estoppel. The old paths are the safe paths. The juries of the country can be safely trusted to find any defendant guilty whose case is really so bad as to estop him to plead self-defense, without resort  dangerous and unwise  to the metaphysical subtleties necessarily involved in the preparation of a proper charge of that sort. Once more we repeat (hoping that "here a little and there a little, line upon line, and precept upon precept" may at last do their work) that if prosecuting attorneys will ask few and very simple charges, and trust more to the common sense and sound judgment of the juries of the country, they will expose their circuit judges to far less risk of reversal, secure just as many convictions, and have far  very far  fewer cases reversed.
79 Miss. at 734, 31 So. at 421.
The language in Lofton v. State is appropriate in this case. From this record it appears the prosecuting attorney made a virtual shambles of the defense in a vigorous and able cross-examination of Hall and his wife. While disclaiming any omniscience to predict what a particular jury will do in any case, I would modestly assert my belief that the state in this case could have trusted the "common sense and sound judgment" of the jury to evaluate the evidence.
The instruction at issue fails to take into account that the accused could very well have had a lawful purpose in arming himself with the shotgun. He was telephoned to come and get his money by one of the Bradleys. He was also informed by his wife of threats against him by the Bradleys. Can we deny him the right to drive over to the Bradley home to collect money lawfully due him? Can we deny him the right to carry a shotgun if he had reasonable apprehension that his life could be in danger while there? If he left his home intending *1391 to use the shotgun, why was it that upon reaching the Bradleys he went to the door without the shotgun?
In Lofton v. State, supra, in condemning such an instruction, we stated: "There is no evidence at all in this record as to what his purpose was in procuring the gun, except his own, and that shows a lawful purpose." 79 Miss. at 734, 31 So. at 421.
Even if there were testimony that Hall armed himself with the shotgun with the deliberate design of provoking trouble (when in fact there is none), this instruction fails to take into account that he could have changed his mind, and at the time of the incident acted in lawful self-defense. For this further reason, the instruction is erroneous. Adams v. State, 136 Miss. 298, 101 So. 437 (1924); Williamson v. State, 115 Miss. 716, 76 So. 637 (1917).
The majority states that one of the issues presented the jury by the instructions was "... whether Hall had abandoned the conflict and was fleeing in good faith, in which event he could invoke the right of self-defense." I can find no place where this issue was presented to the jury by an instruction.
The majority views the instruction denying any claim of self-defense regardless of circumstances, and another (set out in the majority opinion) granted the defendant defining the circumstances in which he can lawfully act in self-defense, as supplementing one another. I view them as being in hopeless conflict. The defense instruction tells the jury that if they believe certain facts existed, the accused had the right to claim self-defense, and they should find him not guilty. By the state's instruction the jury is told, in effect, that it makes no difference if the facts set forth in the defense instruction did exist, that the defendant had no right to claim self-defense. When a jury has agreed upon a certain set of facts and, in looking to the court's instructions, one of the instructions would require reaching one result, and the other would require reaching a different result, such instructions are in conflict. To instruct a jury to apply these two formulas without confusion is an amazing compliment to their erudition. See Holderfield v. State, 215 Miss. 564, 61 So.2d 385 (1952). Moreover, if the jury did understand them, they would have recognized the conflict and their choice between the two would be dependent upon caprice, bias, or conjecture as to which of the two were the more important.[5]
Until this case, for at least a century, this Court consistently has held that an instruction which denied the accused the right to claim self-defense should not be granted except "in few very rare cases." I believe the present holding of this Court is precisely opposite.
I would reverse and remand.
BOWLING and DAN M. LEE, JJ., join this dissent.
NOTES
[1] The indictment contains surplusage in adding to the above the words, "purposely, knowingly, recklessly under circumstances manifesting extreme indifference to the value of human life." No injury resulted in this case. See Miss. Code Ann. § 97-3-7(2) (Supp. 1981).
[2] The majority opinion fails to mention this fact.
[3] Had he been shooting at either, the likelihood is that he would not have missed.
[4] Estoppel quite often is a legal defense to be decided by a judge, but of course in criminal cases peremptory instructions of guilt cannot be given. Winters v. State, 244 Miss. 704, 146 So.2d 350 (1962). Therefore, if such an issue existed in a criminal case, it would have to be submitted to the jury under proper instruction. This, at least, was the law until Parker, supra, which may have changed the rule.
[5] "When the court gives inconsistent instructions on a material issue this violates the principle that the instructions must not mislead the jury and therefore must be consistent and harmonious. The fact that one instruction is correct does not cure the error in giving another that is inconsistent with it." Smith v. United States, 230 F.2d 935, 939 (6th Cir.1956). See also Perez v. United States, 297 F.2d 12 (5th Cir.1961). Furthermore, "the jury should not be required to determine which part of a contradictory charge is correct." Polansky v. United States, 332 F.2d 233, 236 (1st Cir.1964). See generally 1 Reid's Branson Instructions to Juries, § 104 (3rd ed. 1960).